Johnathan MOORE, Appellant,

v.

The STATE of Texas.

No. 72638.

Court of Criminal Appeals of Texas.

April 21, 1999.

Rehearing Denied Oct. 6, 1999.

388

Julie B. Pollock, San Antonio, for appellant.

Barbara Hervey, Assist. DA, San Antonio, Matthew Paul, State's Atty., Austin, for the State.

## O P I N I O N

KELLER, J., delivered the opinion of the court, in which McCORMICK, P.J. and PRICE, HOLLAND, WOMACK, and KEASLER, J.J., joined.

Appellant was convicted of the offense of capital murder, committed January 15, 1995. See Tex. Penal Code Ann. §§ 19.03(a)(1) and (2).[1] Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071 §§ 2(b) and 2(e), the trial judge sentenced appellant to death. Article 37.071 § 2(g).[2] Direct appeal to this Court is automatic. Article 37.071 § 2(h). Thirty-seven points of error are advanced by the appellant on direct appeal. We will affirm.

Appellant was charged in a two paragraph indictment with committing the capital murder of Fabian Dominguez. The first paragraph alleged murder of a peace officer acting in the lawful discharge of an official duty. The second paragraph alleged murder in the course of burglary of a habitation.

### Statement of Facts

On January 15, 1995, at approximately 5:00 a.m., San Antonio police officer Fabian Dominguez went off duty and began driving home in his personal vehicle. Officer Dominguez lived in San Antonio with his wife and infant twin daughters. Officer Dominguez was a few blocks from home when he noticed suspicious activity at the residence of William Braden. Based on what Officer Dominguez observed, he took action to investigate what appeared to be a burglary in progress. When he pulled into the Braden driveway, blocking in the suspects' vehicle, Paul Cameron, Pete Dowdle, and appellant were concluding their second trip to burglarize the Braden home.

In his voluntary written statement to Detective James Holguin, appellant described the sequence of events leading up to the murder of Officer Dominguez.

> For some dumb reason we decided to go back to the house on Country Flower. We went in Pete's grandmother's car.... Pete drove. I was in the front passenger side of the car and Paul was in the backseat. Pete backed the car into the driveway. Pete stayed out in the car. We had accidently left the front door wide open the first time. Me

---

1. Under Tex. Penal Code Ann. § 19.03(a)(1) a person commits capital murder if the person murders a peace officer or fireman who is acting in the lawful discharge of an official duty and who the person knows is a peace officer or fireman. Under Tex. Penal Code Ann. § 19.03(a)(2) a person commits capital murder if the person intentionally commits the murder in the course of committing burglary.

2. Unless otherwise indicated all future references to Articles refer to the version of the Code of Criminal Procedure in effect at the time of appellant's trial.

and Paul went in through the front door. We didn't have any problem with the dog. All three of us were wearing gloves again. We had left some guns and a compound bow were left (sic) from the first time. We got those things. Me and Paul decided to split form (sic) the inside. We walked outside and we saw a car passing by. The car stopped and I saw the reverse lights come on. We all got into the car. Pete was behind the wheel. I was in the front passenger seat and Paul was in the backseat. The car pulled into the driveway and pretty much blocked us in. The police officer got out of the car and had his gun pointing at Pete. I could see that this guy was wearing a police uniform. The officer said get out of the car now. I had my window rolled down. The officer kept repeating "get out of the car". . . . . I kept telling Pete let's split but he would not do it. By the time the officer walked up to the car and had the gun pointed at my head. (sic) The officer was on the passenger side of Pete's car. The officer told Pete to give him the car keys and Pete gave it to him. I scooted the officer's pistol away and I pulled out my gun and shot at him. I believe I shot at him three times. The officer fell to the ground. I already had my gun in my hand when the officer walked up. My gun is a .25 caliber automatic. It's plated and it's a Lorcin brand. After I shot the officer his gun fell into the front rear seat of Pete's car. I got out of the car and I got the car keys and gave them to Pete. I got the officer's gun and shot the officer three times in the head. I got back in the car and Pete split. Paul was in the backseat during the whole time. Pete didn't want to get into trouble after I shot the cop so he drove away.

Neighbors across the street heard gunfire coming from the Braden home. Upon receiving a 911 call, police and emergency personnel were immediately dispatched. Officer Dominguez was dead by the time firemen arrived on the scene. The coroner later determined that Officer Dominguez died from multiple gunshot wounds to the head. Ballistics established that the wounds were inflicted by one shot from appellant's .25 caliber handgun, and three shots from Officer Dominguez's .40 caliber service weapon.

After leaving the scene of the crime, appellant, Cameron, Dowdle, and appellant's girlfriend, Meredith Nichols, traveled to a plot of land near Pipe Creek, Texas, where they disposed of both murder weapons and the items stolen from the Braden residence.

The following day appellant was developed as a suspect in the burglary. He was subsequently located and seen driving a vehicle that belonged to Nichols. Nichols was a passenger in the vehicle. While under police surveillance, appellant committed numerous traffic violations. When police officers signaled him to pull to the side of the road, a high speed chase ensued. Twenty miles later, appellant and Nichols were captured after appellant careened to the side of the road. After a brief struggle, San Antonio police officers arrested appellant and took him into custody. In his voluntary statement to Detective Holguin appellant explained his flight from authorities, stating, "I figured pretty much that the cops knew that I was the one that shot the cop."

## I. Competency

In his first three points of error appellant claims the trial court erred in failing to empanel a jury to determine his competency to stand trial.

Article 46.02, § 1 of the Texas Code of Criminal Procedure provides:

(a) A person is incompetent to stand trial if he does not have:

(1) sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding; or

(2) a rational as well as factual understanding of the proceedings against him.

(b) A defendant is presumed competent to stand trial and shall be found competent to stand trial unless proved incompetent by a preponderance of the evidence.

If the court determines that there is evidence to support a finding of incompetency to stand trial, a jury is to be impaneled to determine the defendant's competency to stand trial. This determination shall be made by a jury that has not been selected to determine the guilt or innocence of the defendant. Article 46.02.

▆▆▆ In determining whether evidence requires empaneling a separate jury to conduct a competency hearing, the trial court is to consider only the evidence tending to show incompetency, and not evidence showing competency, in order to find whether there is some evidence, a quantity more than none or a scintilla, that rationally could lead to a determination of incompetency. *Sisco v. State*, 599 S.W.2d 607 (Tex.Crim.App.1980). The same standard is applied whether the issue of competency is presented pre-trial or during trial. *Williams v. State*, 663 S.W.2d 832 (Tex.Crim.App.1984). A competency hearing is not required unless the evidence is sufficient to create a *bona fide* doubt in the mind of the judge whether the defendant meets the test of legal competence. *Ex Parte Thomas*, 906 S.W.2d 22, 25 (1995), *cert. denied*, 518 U.S. 1021, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996); *Mata v. State*, 632 S.W.2d 355, 357 (Tex.Crim.App.1982). On appeal the standard of review is whether the trial court abused its discretion by failing to empanel a jury for the purpose of conducting a competency hearing. *Garcia v. State*, 595 S.W.2d 538 (Tex.Crim.App. 1980).

In the case at bar, the issue of competency was first raised during a pretrial hearing on a motion to suppress evidence. During an *ex parte* hearing before the trial judge in May of 1996, defense counsel requested that proceedings be halted until a psychiatrist examined appellant. The trial court declined to halt proceedings but agreed to appoint Dr. Michael Arambula to evaluate appellant's competency and to report his findings. Four months later the trial court proceeded to voir dire. During the interim between the pre-trial *ex parte* hearing and voir dire, Dr. Arambula's report was not submitted to the court, nor was Dr. Arambula called to provide pretrial testimony as to the appellant's competency to stand trial.[3] At voir dire, the defense announced its intent to present an insanity defense. The State responded by requesting that the court appoint Dr. John Sparks to evaluate appellant for the purpose of determining competency and sanity. After conducting an examination, Dr. Sparks came to the conclusion that the appellant was both sane at the time of the killing and competent to stand trial.

On appeal, it is asserted that (1) appellant's comments and outbursts, (2) mental health history, and (3) decision to represent himself during portions of the trial constituted evidence warranting a competency hearing.

## A. Comments and Outbursts by the Appellant

▆▆▆ During the pretrial hearing, defense counsel relayed their difficulty in communicating with appellant. The record reveals that defense counsel stated:

"Just so that there is an adequate record for the Court's information, it's not just the blurting out in court. It's that I'm sure the Court has observed after each one of those instances counsel, both counsel, trying to discuss the matter with the client. And although I can't go

---

**3.** At a pretrial hearing, Dr. Arambula testified that he interviewed appellant for the purpose of evaluating: (1) whether appellant had a mental illness, (2) whether it was active at the time of the offense, and (3) whether it interfered with appellant's knowledge of right and wrong. Subsequently at trial Dr. Arambula and another expert witness, Dr. Margaret Zeulzer, testified that in their opinions appellant was insane at the time of Officer Dominguez's murder. Dr. Arambula's testimony was offered only as to the issue of sanity.

into the exchange that takes place, I can do and do, as an officer of this court, tell you that that (sic) I'm talking in apples and the responses are in oranges. .... [I]n my opinion as a layman, he does not have a rational nor factual understanding of the nature of the proceedings against him."

In response to this comment and other comments about appellant's outbursts, the trial judge responded:

".... [A]t this point I'm not convinced that there's evidence sufficient to persuade the Court that I need to have a competency hearing for Mr. Moore. However, in an abundance of caution I will go ahead and appoint Dr. Arambula to examine Mr. Moore and give the Court an opinion on what he thinks about his ability to stand trial. In the meantime I plan to carry on with the proceeding."

Defense counsel responded:

"Based on that, we do object to proceeding until there's a determination made about his competency."

■ It is not enough, as is the case here, for counsel to allege unspecified difficulties in communicating with the defendant. Information which raises the issue of a defendant's competency to stand trial can be provided by defense counsel. *Arnold v. State*, 873 S.W.2d 27 (Tex.Crim. App.1993). However, such information must be specific and illustrative of a present inability to communicate with the defendant. *Bowser v. State*, 816 S.W.2d 518 (Tex.App.-Corpus Christi 1991, *rev'd on other grounds* ).

■ The record reveals that throughout trial the judge properly managed the issue of competency each time it was raised by defense counsel. Article 46.02, § 4(c) contemplates that when the issue is raised in a manner other than pretrial under § 2(a), the trial court is to determine whether there is evidence to support a finding of incompetency to stand trial. Section 4(c) does not necessarily require a

halting of proceedings and a separate determination on competence. Rather, trial judges have discretion to decide when to conduct an inquiry. If as a result of the inquiry the trial judge determines that there is evidence to support a finding of incompetence to stand trial, the court is free to set the issue for hearing at any time prior to the sentencing of the defendant. *Williams v. State*, 663 S.W.2d 832, 834 (Tex.Crim.App.1984).

■ Counsel also asserts that appellant's repeated outbursts in the courtroom provided the primary basis for a competency hearing to be held by the trial court. In three instances appellant's outbursts occurred during the testimony of other witnesses:

Q: Okay. And since his arrest and apprehension, have you had occasion to see the booking photographs?

DEFENDANT: Does Jesus Christ have long hair and a beard? You've seen pictures of Him. What makes the difference between Jesus Christ and Charles Manson?

\* \* \*

Q: Tell the Court what he said.

A "There's the bitch. We're going to treat you like a man." Grabbed me by the hair, threw me down on the ground, proceeded to kick me.

DEFENDANT: Fucking pigs! (Whereupon, there was an outbreak caused by the defendant).

\* \* \*

Q: You obviously struck coming back down the hill. Yet you say that you were not moving forward. The police car is the one that rammed you both times. How do you explain that?

DEFENDANT: Physics explained it. Physics. You have taken physics. What do you not understand about

physics? You have a college education, don't you?

Appellant asserts that the above outbursts provided sufficient grounds for holding a competency hearing. We disagree. While appellant's comments were inappropriate violations of court decorum, they do not constitute evidence of his inability to communicate with counsel, or factually appreciate the proceedings against him. To the contrary, appellant's outbursts were timely, topical, and logically related to the questions and answers offered during the examination of other witnesses. We reject appellant's contention that his unruly and disruptive courtroom demeanor are probative of incompetence to stand trial. If such actions were probative of incompetence, one could effectively avoid criminal justice through immature behavior. *Burks v. State*, 792 S.W.2d 835 (Tex.App.-Houston [1 st Dist.]1990, pet. ref'd).

### B. Mental Health History

 Three years prior to the murder of Officer Dominguez, appellant was hospitalized for depression. On appeal, counsel asserts that information relayed to the trial court regarding appellant's prior commitment to a mental health facility and treatment with psychotropic medication warranted an incompetency hearing.[4] Additionally, it is asserted that appellant's family history of mental illness and alcoholism constituted evidence requiring a competency hearing.

 Prior hospitalization and treatment for depression do not *per se* warrant the trial court empaneling a separate jury to conduct a competency hearing. To raise the issue of competency by means of the defendant's past mental health history, there generally must be evidence of recent severe mental illness or bizarre acts by the defendant or of moderate retardation. *Mata*, supra at 359, citing *Porter v. State*,

623 S.W.2d 374 (Tex.Crim.App.1981). Lower courts have held that a trial court is within its power to find a defendant competent without a section 2 hearing despite evidence of depression or prior hospitalization when such evidence fails to indicate adequately either severe mental illness or recent impairment. *State v. Thompson*, 915 S.W.2d 897, 902 (Tex.App.-Houston [1 st Dist.] 1996, pet. ref'd); see also *Ryan v. State*, 937 S.W.2d 93, 105–106 (Tex.App.Beaumont 1996, pet. ref'd.). We agree. A defendant's propensity toward depression does not necessarily correlate with his ability to communicate with counsel or his ability to understand the proceedings against him.

At trial two witnesses (Dr. Zuelzer and Dr. Arambula) testified that appellant manifested symptoms of schizo-affective disorder, while two other witnesses (Dr. Sparks and Dr. Cesar Garcia) testified that appellant was neither psychotic nor suffering any major affective disorder. Rather, Dr. Sparks and Dr. Garcia both testified that the most serious mental illness appellant experienced was dysthymia—a neurosis involving the mildest level of depression.

 Evidence of mental impairment alone does not require that a special jury be empaneled where no evidence indicates that a defendant is incapable of consulting with counsel or understanding the proceedings against him. *Townsend v. State*, 949 S.W.2d 24, 26–27 (Tex.App.San Antonio 1997, no pet.) (evidence that defendant was depressed and suicidal did not warrant an incompetency hearing); *Lingerfelt v. State*, 629 S.W.2d 216 (Tex.App.-Dallas 1982, pet. ref'd) (testimony from psychiatrist that defendant suffered from schizophrenia did not warrant a competency hearing). Similarly, the mental health history of appellant's immediate family does not necessarily bear on appellant's individ-

---

**4.** While hospitalized appellant was treated with Prozac, a frequently prescribed antide- pressant.

ual ability to communicate with counsel or understand the proceedings against him. It is within the purview of the trial judge to distinguish evidence showing only impairment from that indicating incompetency as contemplated by the law. The record reveals that the trial judge recognized this distinction and ruled accordingly.

### C. Self–Representation

■ On two separate occasions during trial, appellant temporarily terminated assistance of counsel. The first instance occurred on October 10th during a portion of appellant's case in chief. Then, between the dates of October 22nd and October 23rd, appellant represented himself during a portion of the punishment phase of his trial. Appellant's counsel now asserts that appellant's decision to represent himself bolsters the notion that the trial court should have conducted a competency hearing. We disagree.

■ The Sixth and Fourteenth Amendments to the United States Constitution guarantee that a person brought to trial in any state or federal court may dispense with counsel and make his own defense. *Faretta v. California,* 422 U.S. 806, 818–820, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975). Such a decision, to be constitutionally effective, must be made (1) competently, (2) knowingly and intelligently, and (3) voluntarily.[5] *Godinez v. Moran,* 509 U.S. 389, 400–401, 113 S.Ct. 2680, 2687, 125 L.Ed.2d 321 (1993); *Faretta v. California,* 422 U.S. at 834–836, 95 S.Ct. at 2541; see also Article 1.051. This Court has previously rejected the assertion that a defendant's decision to represent himself in a capital murder case constitutes evi-

dence of incompetence. *Vigneault v. State,* 600 S.W.2d 318, 322–323 (Tex.Crim. App.1980).

The record reflects the following: (1) Appellant was clearly and repeatedly admonished by the judge as to the dangers and disadvantages of self-representation;[6] (2) Appellant claimed that his decision to proceed *pro se* was based on his distrust and dissatisfaction with appointed trial counsel; (3) the trial judge allowed appellant to represent himself and appointed defense counsel as standby counsel; (4) Appellant asked appropriate questions during cross-examination and re-cross; (5) Appellant made successful evidentiary objections; and (6) Appellant ultimately reinstated defense counsel after one day of self-representation.

■ In light of the record, we cannot say that appellant's decision to proceed *pro se* was anything less than knowing and intelligent. Nor can we find anything in the record indicating that appellant's decision was anything less than voluntary. A knowing, intelligent, and voluntary waiver of counsel is not evidence of incompetency. In fact, appellant showed during his period of self-representation the ability to communicate effectively and to participate in the proceedings against him. Thus, we reject the argument that appellant's decision to exercise his constitutional right to self-representation is evidence of incompetency.

As we have previously explained, there is no easy test for determining when evidence meets the deceptively simple *bona fide* standard. *Mata, supra* at 358. Nevertheless, as to appellant's comments and outbursts, mental health history, and deci-

---

**5.** The decision to waive counsel and proceed *pro se* is made "knowingly and intelligently" if it is made with a full understanding of the right to counsel, which is being abandoned, as well as the dangers and disadvantages of self-representation. *Faretta v. California,* 422 U.S. at 834–836, 95 S.Ct. at 2541. The decision is made "voluntarily" if it is uncoerced. *Godinez v. Moran,* 509 U.S. at 401 n. 12, 113 S.Ct. at 2687 n. 12.

**6.** The court also explained to him that there were technical rules of evidence and procedure that applied at trial, that he would not be granted any special consideration with respect to those rules, and that as a result he might be disadvantaged both at trial and in any appeal that might follow.

sion to represent himself during portions of the trial, the record supports the trial judge's conclusion that there was no *bona fide* doubt as to appellant's competency to stand trial. Hence, the trial court was not required to conduct a competency hearing. *Drope v. Missouri,* 420 U.S. 162, 173, 95 S.Ct. 896, 904, 43 L.Ed.2d 103 (1975); *Pate v. Robinson,* 383 U.S. 375, 385, 86 S.Ct. 836, 842, 15 L.Ed.2d 815; *Ex Parte Thomas,* 906 S.W.2d 22, 25 (1995); *see also* Article 46.02 § 2.

Appellant's first three points of error are overruled.

## II. Omissions from the Record

■ In point of error twelve appellant asserts that the record on appeal omits portions of the trial proceedings, thus entitling him to a new trial. The State acknowledges that a written pre-trial motion was filed with the trial court requesting that the court reporter record bench conferences. It is uncontested that the court granted the motion. During the State's rebuttal at the guilt/innocence phase of the trial, defense counsel objected to the fact that the court reporter was not transcribing all matters verbatim, and thus the record was incomplete. Defense counsel's subsequent motion for mistrial was overruled. Appellant filed with this Court an objection to the statement of facts and a motion to supplement the reporter's record. Tex.R.App. Proc. 34.6(e).[7]

No witness testimony is alleged to have been omitted, nor have notes or records been lost. Rather, appellant's complaint deals with the failure of the court reporter to record particular bench conferences. The distinction between lost or destroyed records and unrecorded proceedings is set forth in *Williams v. State,* 937 S.W.2d 479, 486 (Tex.Crim.App.1996).[8] See also *Jones*

*v. State,* 942 S.W.2d 1 (Tex.Crim.App. 1997).

In *Walthall v. State,* 594 S.W.2d 74, 81 (Tex.Crim.App.1980), we addressed the issue of what was necessary to preserve a complaint that the record did not include the bench conferences from trial. We said in that case that though the defendant had requested that the trial proceedings be recorded, it was nevertheless incumbent upon him to object if the bench conferences were not recorded. Since he had neither objected at trial nor objected to the record, and since he did not allege that anything pertinent to the appeal had occurred during the bench conferences, there was no reversible error.

This case differs from *Walthall* because there was no indication in *Walthall* that there was a specific request that bench conferences be recorded. And in *Walthall* we did not make clear exactly what one would need to do to preserve error, i.e., whether error is preserved by a mere objection at trial (or a mere objection to the record); whether a defendant must object at trial *and* allege that something pertinent is missing; whether error is preserved by a mere allegation that something pertinent is missing; or whether one must object at trial, object to the record, *and* allege that something pertinent is missing. In other words, we simply held that the failure to do all three of those things resulted in no reversible error.

Nevertheless, it appears to us that *Walthall* stands for the proposition that one must object *at some time* to the failure to record bench conferences, and, as with all objections, in order to be timely the objection must be at a time at which the trial court may remedy the omission. Also, it appears that the failure at least to allege that anything pertinent is missing may defeat one's claim, even after an objection.

---

7. Formerly Tex.R. App Proc. 50, Rule 34.6(e) pertains to inaccuracies in the reporter's record.

8. In *Williams* we held that where there is neither a lost nor destroyed record, but rather a portion of the trial proceedings where the court reporter fails to make a record, former Rule 50(e) is inapplicable.

In this case, we could view the granted motion to record bench conferences as a substitute for an objection, or we could view it as more akin to a motion in limine or a motion to suppress evidence so that, even after the granting of the motion, error is not preserved without an objection at trial. Normally, a motion to record testimony should be sufficient to preserve a complaint that the testimony was not recorded. But the clear implication from *Walthall* is that bench conferences are different from normal "trial proceedings." One should not be able to obtain a reversal of his conviction for the failure to record bench conferences when a timely objection would have prevented the error or when nothing pertinent to the appeal is missing from the record. For purposes of preservation of error, the granting of a motion to record bench conferences should be treated similarly to the granting of a motion in limine or a motion to suppress evidence. In all three situations, the granting of a pretrial motion tells the trial participants how to proceed upon the occurrence of certain events. While a pretrial motion relieves the party of the burden of obtaining permission to have each bench conference recorded as it occurs, it does not, standing alone, preserve error.

Appellant objected at trial to the failure to record bench conferences. After the objection, all conferences were recorded. But the objection was untimely as to the earlier conferences. And while appellant did object to the statement of facts, he failed to make timely efforts to *document* the substance of any of the bench conferences the court reporter failed to record. An objection and request for a mistrial without some attempt to supplement the trial record with the substance of the unrecorded bench conferences is an inadequate basis for alleging that anything pertinent for the purpose of appeal transpired. Analogizing to principles of law applicable to Texas Rules of Appellate Procedure 52 and 55,[9] we hold that the record must reflect that trial counsel either (1) attempted to stipulate with opposing counsel and the trial court the substance of unrecorded bench conferences, (2) requested that the trial court reflect the substance of the unrecorded bench conferences in the statement of facts, or (3) made a formal bill of exception regarding the substance of the unrecorded bench conference. A motion to record bench conferences does not shift to the opposing party the burden to show what transpired at the conferences, just as a motion in limine or motion to suppress does not shift the burden to the opposing party.[10]

Defense counsel's discovery of and objection to the court reporter's failure to record all bench conferences was made on October 18, 1996. Yet defense counsel's attempt to supplement the record as to the substance of the unrecorded bench conferences occurred on January 19, 1998, when he requested that the record be supplemented with the bench conferences, if possible. Appellant attached an affidavit to the motion, alleging what was in the unrecorded bench conferences. However, such an affidavit is not a part of the appellate record. *Williams v. State*, 937 S.W.2d 479, 487 (Tex.Crim.App.1996).[11] Accordingly, we find that appellant has failed to take steps to cure the deficiency in the record and has failed to document in the record that anything pertinent to this appeal took place at the unrecorded bench

---

9. Current Rules 33.2 and 34.6(e)

10. The motion to record bench conferences includes a certificate of service, but it is not filled out and it is unsigned.

11. The affidavit asserts that the omitted bench conferences pertained to (1) Officer Dominguez's religious activities, (2) a sawed-off shotgun recovered along with the murder weapons and the items stolen from the Braden residence, (3) a diagram of the murder scene made in connection with appellant's statement to officers, and (4) appellant's desire to fire his attorneys.

conferences. Point of error twelve is overruled.

## III. Appellant's Presence at Court Proceedings

In his twenty-fourth, twenty-fifth, and twenty-sixth points of error appellant alleges error in the trial court's exemption of prospective jurors in his absence. Specifically, appellant asserts that "the jury panel was in place" and "that the court began qualifying jurors without counsel or defendant present." Appellant claims such conduct violated Article 33.03, his rights under the Sixth and Fourteenth Amendments to the United States Constitution, and Article 1, §§ 10 and 19 of the Texas Constitution. We disagree.

Article 33.03 provides in relevant part that "[i]n all prosecutions for felonies, the defendant must be personally present at the trial[.]" In *Chambers v. State,* 903 S.W.2d 21, 30 (Tex.Crim.App.1995), this Court held that a defendant's "trial" does not include jury panel formation during the general assembly. In setting forth our rationale we explained that prospective jurors summoned to a general assembly are not assigned to any particular case. With no given case in mind, a judge presiding over a general assembly is assigned for the purpose of considering excuses from prospective jury members and determining whether any of the prospective jury members are eligible for statutory exemption. *See,* Article 35.03; V.T.C.A., Government Code § 62.106; .Article 35.04. The right to be excused from the venire belongs to each of its individual members, not to the defendant. While some members of the venire may choose to appear in person, the Code of Criminal Procedure allows people summoned to claim an exemption without appearing before the court. Article 35.04. Recognizing the distinction between the rights of prospective jurors and criminal defendants, we have held that a court's decision to excuse prospective members claiming an exemption does not infringe on a defendant's right to equal protection. *Burks v. State,* 876 S.W.2d 877 (Tex.Crim. App.1994); *Johnson v. State,* 548 S.W.2d 700, 703–704 (Tex.Crim.App.1977).

While appellant argues that "the jury panel was in place in Johnathan Moore's case and that the court began qualifying jurors without counsel or defendant present," the record suggests the general assembly had not been assigned to any particular case.[12] Accordingly, we find no violation of appellant's statutory or constitutional rights. Points of error twenty-four, twenty-five, and twenty-six are overruled.

## IV. Violation of Article 35.03

Appellant's twenty-third point of error alleges that the trial judge violated Article 35.03 by not entertaining excuses and exemptions from jury service of prospective jurors.

Judge Sharon MacRae of the 290th District Court presided over appellant's trial. By assignment, Judge Pat Priest presided over the weekly general assembly of veniremen prior to presiding over voir dire in appellant's case. Appellant argues that Judge MacRae's failure to entertain excuses and exemptions from the general assembly of prospective jurors violated Article 35.03(2) of the Code of Criminal Procedure, which states:

... in a case other than a capital felony case, the court's designee may hear and determine an excuse offered for not serving as a juror, and if the court's designee deems the excuse sufficient, he may postpone the juror's service to a date specified by the court's designee.

12. The Court: "Because *I was qualifying them as jurors for the week and not for this case at that time,* I didn't feel it necessary to have anybody else here. However, for the protection of the defendant and the State, I had a court reporter take down the entire process. There will be a complete record for any interested appellate court of what took place."

Appellant's argument asserts that Judge Priest was a "designee," and thus not entitled to entertain excuses and exemptions in this capital murder case. We disagree with Appellant's categorization. Judge Priest was a visiting judge assigned to the matter in question. In setting out the powers and duties of assigned judges, section 74.059(a) of the Texas Government Code states that "[a] judge assigned under the provisions of this chapter has all the powers of the judge of the court to which he is assigned." Accordingly, Judge Priest was legally entitled to conduct duties that otherwise would have been assigned to Judge MacRae in her role as trial judge. Appellant's twenty-third point of error is overruled.

### V. Challenge for Cause to Venireman Scoskie

▆▆▆▆ In point of error number twenty-two, appellant asserts that the trial court erred by improperly sustaining the State's challenge for cause to venireman Scoskie. Scoskie was excused on the basis that she would require the State to prove premeditation as prerequisite for the imposition of the death penalty. In *White v. State*, 779 S.W.2d 809, 823 (Tex.Crim.App. 1989), we held that it is proper for a trial court to sustain a State's challenge for cause of a venireman who, in essence, feels that only premeditated murder warrants capital punishment. Appellant does not deny that *White* provides a rule of law upon which the State was entitled to rely. Rather, appellant argues that Scoskie had made it unequivocally clear prior to the State's challenge for cause that she was capable of following the law as to this particular issue of premeditation, and hence the trial court abused its discretion in allowing a challenge for cause. *Brown v. State*, 913 S.W.2d 577, 580 (Tex.Crim. App.1996). The record, however, is equivocal as to Scoskie's ability to follow the law. While in portions of the record she states she would not require that premeditation be shown before imposing the death penalty, in other portions she suggests that she would require premeditation. When the record reflects that a venireman vacillates or equivocates on his ability to follow the law, the reviewing court must defer to the trial court. *Id.* at 580. Also see *Jones v. State*, 982 S.W.2d 386, (Tex. Crim.App.1998).

Accordingly, we overrule the appellant's twenty-second point of error.

### VI. Admission of Appellant's Oral Statements

Points of error five and six assert that the trial court erred in admitting into evidence an oral statement made by appellant subsequent to arrest.

Article 38.22 of the Texas Code of Criminal Procedure in pertinent part provides:

Sec. 3. (a) No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:

\* \* \*

▆▆▆▆ (c) Subsection (a) of this section shall not apply to any statement which contains assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused, such as the finding of secreted or stolen property or the instrument with which he states the offense was committed.

As a general rule, under section 3(a), oral confessions are not admissible. However, as an exception set out in section 3(c), oral statements asserting facts or circumstances establishing the guilt of the accused are admissible if at the time they were made they contained assertions unknown by law enforcement but later corroborated. *Dansby v. State*, 931 S.W.2d 297 (Tex.Crim.App.1996); *Gunter v. State*, 858 S.W.2d 430 (Tex.Crim.App.1993). Such oral statements need only circumstantially demonstrate the defendant's

guilt. *Port v. State,* 791 S.W.2d 103 (Tex. Crim.App.1990). Furthermore, if such an oral statement contains even a single assertion of fact found to be true and conducive to establishing the defendant's guilt, then the statement is admissible in its entirety. *Marini v. State,* 593 S.W.2d 709 (Tex.Crim.App.1980).

██ Appellant asserts that the police knew all of the facts supplied by him in his confession prior to the making of that statement.[13] Accordingly, he claims the State has failed to satisfy the exception of Article 38.22 § 3(c). We disagree.

While the trial court concluded that appellant made various oral statements which conduce to establish his guilt, the most significant is his statement concerning a compound bow taken in the burglary. In describing how he and his accomplices disposed of items related to the burglary and murder, appellant stated, "All that was in the car was a compound bow and binoculars, my .25 caliber pistol, the officer's pistol, and a sawed-off shotgun."

According to Detective McCourt, who sat in on appellant's interview, at one point Detective Holguin left the room and McCourt asked appellant something about the bow. Though all of the other items related to the burglary and murder had been discovered prior to appellant's statement, no compound bow had been recovered. During his discussion with McCourt, appellant said that the bow would not be found at the same place he and his accomplices had put the other stolen property. Appellant told McCourt that he had tired of carrying the various items and had thrown the bow in another direction from the general vicinity of the other stolen property. At the time appellant revealed this information, neither law enforcement nor William Braden, the owner of the bow, were aware that the compound bow had been stolen from the scene of the crime. It was not until the next day

that the information about this bow was confirmed by its discovery in Bandera County near but not in the same location as the other stolen property which had been discovered the previous evening. Appellant's statements about the compound bow contained assertions of fact unknown by law enforcement but later corroborated. In accord with our holding in *Marini,* appellant's oral statement about the compound bow contains facts which were found to be true and were conducive to establishing guilt. Hence his entire oral statement was properly deemed admissible under Article 38.22. Point of error five is overruled.

██ With the oral statement being admissible, the final issue for consideration is the manner in which it was put into evidence. Unable to recollect appellant's complete statement, Detective Holguin was allowed by the trial court to read appellant's statement as a past recollection recorded. Tex. Rule Crim. Evid. 803(5). Appellant argues that the statement was hearsay and should not have been admitted as a recollection recorded because Holguin lacked the personal knowledge required by Rule 803(5). We disagree with appellant's assertion that the reading of the transcribed oral statement constituted hearsay. By signing Detective Holguin's transcription of the oral statement, appellant manifested an adoption or belief in its truth. Accordingly, it was an admission by a party opponent, and not hearsay. *See* Tex.R.Crim. Evid. 801(e)(2)(B). Point of error six is overruled.

## VII. Admission of Appellant's Hand-drawn Diagram

██ In points of error seven and eight it is alleged that the trial court erred in admitting into evidence as an oral statement a drawing made by appellant at the time he gave his written statement. It is

---

**13.** Portions of the statement in question have previously been reproduced in the "Statement of Facts."

further asserted in point of error eight that the court erred by allowing the prosecution to publish the diagram to the jury.

■ The trial court found that appellant's written statement failed to comply with Article 38.22 § 2. The court's findings of fact establish that the diagram was admitted as an oral statement, under the § 3(c) exception in Article 38.22. Appellant contends that the admission of the diagram as an oral statement, subject to the § 3(c) exception, completely abrogates Article 38.22. We agree. Article 38.22, § 3, applies only to oral statements, and the § 3(c) exception is applicable only to oral statements. Since the diagram was not an oral statement it was error to admit it under the § 3(c) exception.

■ The State's position is that appellant was not harmed by admission of the diagram. Because the error consists of the violation of a statute, it is to be disregarded unless it affects appellant's substantial rights. Tex.R.App. P. 44.2(b). The content of the diagram (specifically, the location of Officer Dominguez's car in relation to vehicle of the offenders) was established by the testimony of other witnesses at trial, including witnesses offered by the defense after objection to the diagram was made. Thus evidence of the subject of the diagram was admitted elsewhere without objection. The admission of the same evidence from another source, without objection, waives previously stated objections. *Massey v. State*, 933 S.W.2d 141, 149 (Tex.Crim.App.1996). Though the format of the evidence differed, the content of the evidence (the relative locations of the vehicles) was the same. In light of the record viewed in its totality, the error was harmless. Points of error seven and eight are overruled.

## VIII. Failure to Instruct the Jury

In point of error eleven appellant claims that the trial court erred in failing to instruct the jury to disregard the unresponsive answers of defense witness Barbara Moore. Mrs. Moore, appellant's mother, testified concerning mitigating evidence about appellant's childhood. During questioning by defense counsel, Mrs. Moore became unresponsive and began berating the court with obscenities. After efforts to control Mrs. Moore's tirade proved futile, the jury was escorted from the courtroom. Ultimately, Mrs. Moore was removed from the courtroom.

After order was restored, defense counsel moved for a mistrial. The motion was denied. Subsequently, defense counsel requested that the jury be instructed to disregard Mrs. Moore's outburst. This request was also denied. Appellant claims that the court's failure to instruct the jury to disregard Mrs. Moore's outburst contributed to the assessment of the death penalty, and thus appellant is entitled to a new punishment hearing. The State's position is that the defense should not now be allowed to benefit from what it categorizes as a "strategic display of the uncontrollable mother." See *Jones v. State*, 153 Tex.Crim. 345, 220 S.W.2d 156, 159 (1949) (holding that an accused may not bring out objectionable testimony and then predicate error upon the refusal of the court to strike it from the record).

■ While defense counsel admittedly knew of Mrs. Moore's volatile nature, we are not convinced that her outburst was anticipated or that defense counsel's questions were designed to "bring out" objectionable testimony. Nevertheless, the witness herself seemingly intended to benefit her son with her comments that the police had lied and that appellant's confession had been beaten out of him -at least she did until she said the jury was "full of bullshit." [14] Mrs. Moore was a

---

14. In fact, even then the witness may have been acting by design. At the guilt-innocence phase of trial, defense counsel attempted to prove that the appellant was insane at the

time he killed Officer Dominguez, by offering appellant's family history of mental illness and alcoholism. The defense contended that the behavior of appellant's parents somehow

defense witness and the testimony took place during direct examination. The prosecutor objected to the outburst, but defense counsel did not. In order to have timely objected to his own witness's non-responsive answer, counsel should have lodged an objection at the earliest opportunity or as soon as the ground became apparent. *See Beckley v. State*, 827 S.W.2d 74, 77 (Tex.App.—Fort Worth 1992, no pet.) By failing to object to Mrs. Moore's non-responsive testimony, and requesting an instruction to disregard only at the end of the testimony, appellant waived any complaint on appeal. The trial court did not err in refusing to instruct the jury to disregard Mrs. Moore's outburst. Point of error eleven is overruled.

## IX. The Testimony of Dr. Cesar Garcia

█ In his thirteenth point of error appellant alleges the trial court erred in admitting the testimony of Dr. Cesar Garcia in violation of appellant's Sixth Amendment rights. In alleging a violation of *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), appellant claims that his right to counsel had attached at the time he was interviewed by Dr. Garcia and that "the jury could have used Garcia's testimony in determining the issue of future dangerousness."

In *Estelle v. Smith*, the testimony of the defendant was procured, by a psychiatrist in the absence of counsel, initially for the sole purpose of a neutral competency hearing examination. Subsequently, the same psychiatrist relied on comments made by the defendant during the competency hearing in assessing the defendant's future dangerousness. Because in retrospect the initial examination of the defendant proved to be a "critical stage" of the aggregate proceedings against respondent, the admission of the testimony of the psychiatrist was held to violate the defendant's Sixth Amendment right to counsel.

exacerbated the mental illness which culmi-

Appellant's reliance on *Estelle v. Smith* is misplaced. Dr. Garcia's testimony as a rebuttal witness in the guilt/innocence phase of the trial was not the result of a court-ordered examination, nor did it have anything to do with appellant's future dangerousness. Rather, Dr. Garcia's testimony was limited to his observations as a treating physician at the jail in which he provided psychiatric services to inmates. As a prisoner placed on "suicide precaution," appellant was afforded the attention and care of Dr. Garcia. It appears to us that the testimony of a psychiatrist or other mental health professional stemming from routine treatment provided to a prisoner while incarcerated is inherently different from the testimony of such professionals when they are appointed by the court for the specific purpose of evaluating a defendant's competency to stand trial. Appellant's thirteenth point of error is overruled.

## X. Failure to Instruct on the Lesser Included Offense of Murder

In point of error nine, appellant claims that the trial court erred in failing to grant his request to instruct the jury on the lesser included offense of murder. Appellant claims that the fact Officer Dominguez was off-duty and on his way home is some evidence that Dominguez was not acting in the "lawful discharge of an official duty." Tex. Penal Code Ann. § 19.03(a)(1). Accordingly, appellant claims that the charge should have included the lesser included offense of murder. Appellant also claims that there was evidence suggesting that he had permission of Braden's daughter, Andrea, to enter the habitation. Hence, appellant claims that he was entitled to a charge on murder because he had effective consent of an "owner" and did not commit the specified underlying capital offense of burglary. Tex. Penal Code Ann. § 19.03(a)(2).

█ In *Aguilar v. State*, 682 S.W.2d 556 (Tex.Crim.App.1985), this Court

nated in the murder of Officer Dominguez.

adopted the two-prong test first enunciated in a panel opinion in *Royster v. State,* 622 S.W.2d 442 (Tex.Crim.App.1981). The first prong requires that the lesser included offense must be included within the proof necessary to establish the offense charged. Secondly, there must be some evidence in the record that if the defendant is guilty, he is guilty of only the lesser offense. *Aguilar,* 682 S.W.2d at 558.

Appellant's claim that he was entitled to the lesser included offense of murder is unpersuasive. Article 2.13 of the Code of Criminal Procedure provides:

> It is the duty of every peace officer to preserve the peace within his jurisdiction. To effect this purpose, he shall use all lawful means. He shall in every case where he is authorized by the provisions of this Code, interfere without warrant to prevent or suppress crime. [ ... ] He shall arrest offenders without warrant in every case where he is authorized by law, in order that they may be taken before the proper magistrate or court and be tried.

■ Officer Dominguez was acting in the "lawful discharge of his duty," as prescribed by Article 2.13. Thus, when he intervened, he acted in his official capacity.

Furthermore, appellant knew that Fabian Dominguez was a police officer. In his confession there are fourteen instances where appellant makes it clear that he knew Officer Dominguez was a police officer before and during the commission of the offense.

■ Regarding paragraph B of the indictment, the jury was required to consider whether the murder occurred in the course of committing burglary of a habitation. Appellant asserts that there was evidence that Braden's daughter, Andrea, gave him permission to enter the Braden home and take property. He claims that this evidence entitled him to a charge on the lesser included offense of murder. Despite appellant's assertion, the record does not contain such evidence.[15]

But even if there were such evidence, appellant could not prevail. In *Gonzales v. State,* 931 S.W.2d 574, 575–576 (Tex.Crim. App.1996), we held that a daughter's participation in an offense renders her consent to enter a residence ineffective. Even if there were evidence that Andrea told appellant he could enter the house and take property, her participation in the burglary would render any "consent" ineffective. There is no evidence in the record from which a rational trier of fact could have concluded that if appellant was guilty of any offense, he was guilty only of the lesser offense of murder. Thus, under both theories submitted, appellant fails to meet the second prong of the *Royster–Aguilar* test. Point of error nine is overruled.

## XI. Failure to Instruct the Jury on Not Guilty by Reason of Insanity

In his tenth point of error appellant argues that the trial court erred in failing to inform the jury of the consequences of finding him not guilty by reason of insanity. The Texas Legislature has clearly stated that no party, including the trial court, may inform a juror or a prospective juror of the consequences to the defendant if a verdict of not guilty by reason of insanity is returned. Article 46.03, § 1(e). In denying similar contentions from other appellants, we have held that Article 46.03, § 1(e), does not violate the Constitution

---

**15.** In fact, appellant's own statement admits that he was burglarizing the Braden home. The statement reveals in applicable portions:

"Me, Paul Cameron, and Pete Dowdle decided to go break into a house on Country Flower. I know the people that live there. I know that Andrea Braden lives there. I'm not sure on her last name. We decided to do this on the same night of the incident. About two weeks ago, Andrea told me that the back door is left open so that the dog can go in and out. She didn't tell me this so we could break into the house. She was only telling me this in conversation."

and that informing the jury of the consequences of finding a defendant not guilty by reason of insanity is a policy matter exclusively within the purview of the Legislature. *Robison v. State,* 888 S.W.2d 473 (Tex.Crim.App.1994), and *Bigby v. State,* 892 S.W.2d 864 (Tex.Crim.App.1994). Accordingly, point of error ten is overruled.

### XII. Comment on Appellant's Failure to Testify

 In his fourth point of error, appellant alleges that the prosecution made blatant comments on his failure to testify, which should have resulted in a mistrial. During direct examination of Dr. Zuelzer, defense counsel asked the witness to read appellant's responses to questions asked to him as part of the Millon Clinical Multiaxial Inventory (MCMI), a psychological test battery. The following transpired:

> **Dr. Zuelzer:** True or false, and I will just read some of the true. "I have had sad thoughts much of my life since I was a child. "True. I am a very erratic person changing my mind and feelings all of the time. True. I very, very often lose my ability to feel my sensations in parts of my body. True. Other people often blame me for things I did not do. True. People think I sometimes talk about strange or different things than they do. True. There have been times when I couldn't get through the day. True. People are trying to make me believe I am crazy. True. Years later I still have nightmares about an event that was a real threat to my life. True. I hate to think about some of the ways I was abused as a child. True. I sometimes feel crazy-like or unreal when things start to go badly in my life."
>
> **Prosecutor:** Excuse me, ma'am. Judge are we going to listen to every one of these things? Foundations of the basis of her examination. I mean, how much more does she have? There's 175 questions.
>
> **The Court:** I don't know how many more she has.

> **Prosecutor:** Could we ask the Court to inquire and, if so, limit this?
>
> **Defense Counsel:** In what way, Your Honor? She is giving her opinion in this matter. I asked her about—she's testifying.
>
> **Prosecutor:** The answers the defendant gave, which the defendant can testify to.
>
> **Defense Counsel:** Object to that, Your Honor. I object to that as a comment on him testifying and it's self-serving in front of the Jury.

Upon objection by the defense, the jury was escorted from the courtroom. After hearing arguments from both sides, the court held a recess to evaluate the merits of the defense's objection. Outside the presence of the jury the court stated that the comment was an indirect allusion to appellant's failure to testify and denied the defendant's motion for mistrial. After the jury was brought back into the courtroom, the court instructed the jury to disregard the prosecutor's comment. In addition, the jury charge for the guilt/innocence phase of trial instructed the jury that a defendant's election to not testify could play no role in the jury's deliberation of a verdict. Alleging violations of his rights against self-incrimination under the federal and state constitutions and Article 38.08, appellant claims that the statement was a direct comment on his failure to testify and that the instructions did not cure the error.

We agree that the prosecutor's comment was an improper comment upon appellant's failure to testify. However, the trial court instructed the jury to disregard the comment. We have stated that "the ... presumption that an instruction [to disregard] generally will not cure comment on failure of the accused to testify ... has been eroded to the point that it applies only to the most blatant examples. Otherwise, the Court has tended to find the instruction to have force." *Dinkins v. State,* 894 S.W.2d 330, 356 (Tex.Crim.App.1995)(bracketed material

and ellipses in original) (quoting *Waldo v. State,* 746 S.W.2d 750, 753 (Tex.Crim.App. 1988)). When viewed in context, the comment by the prosecutor was intended to prevent the witness from serving as a conduit through which appellant could testify without taking the stand. Moreover, though the comment was in front of the jury, it was directed to the court. We do not believe that the prosecutor's comment was so blatant that it rendered an instruction to disregard ineffective. Accordingly, the court's instruction to disregard the comment cured the error. Point of error four is overruled.

## XIII. The Issue of Youth

### A. Youth as a Reason to Impose the Death Penalty

In points of error fourteen, fifteen, and sixteen, appellant claims that the prosecution's characterization of youth as a reason to inflict the death penalty violated his rights to due process of law and protection against cruel and unusual punishment. During voir dire the prosecution told potential jurors that they *could* consider youth as an aggravating factor under the Texas death penalty scheme. The defense objected that the prosecutor's comment was a misstatement of the law and that jurors should be instructed that youth is a mitigating factor. The objection was overruled.

It is appellant, however, who misstates the law. While appellant cites *Zant v. Stephens,* 462 U.S. 862, 885, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983), as authority, *Zant* does not support his contention. In *Zant* the defendant contended on appeal that his "death sentence was impaired because the judge instructed the jury with regard to an invalid statutory aggravating circumstance, a 'substantial history of serious assaultive criminal convictions.'" *Id.* Here, the jury was not instructed to consider appellant's youth or his personal history as either an aggravating or mitigating factor. Hence, appellant's argument finds no support in *Zant.*

Under Article 37.071, § 2, mitigating evidence is "evidence that a juror might regard as reducing the defendant's moral blameworthiness." We emphasize the importance of the word "might." Neither an attorney nor a judge can tell jurors what evidence is mitigating. Youth is neither a mitigating nor an aggravating factor as a matter of law. *Green v. State,* 934 S.W.2d 92, 105 (Tex.Crim.App.1996). Rather, the facts of the case as interpreted solely by jurors determine if such a factor is a mitigating or aggravating factor, or neither. See *Banda v. State,* 890 S.W.2d 42, 54 (Tex.Crim.App.1994), *cert. denied,* 515 U.S. 1105, 115 S.Ct. 2253, 132 L.Ed.2d 260 (1995); *Robertson v. State,* 871 S.W.2d 701 (Tex.Crim.App.1993), *cert. denied,* 513 U.S. 853, 115 S.Ct. 155, 130 L.Ed.2d 94 (1994).

Appellant cites *Ellason v. State,* 815 S.W.2d 656, 663 (Tex.Crim.App.1991), for the proposition that "youth by its very nature is a mitigating factor to be noted and considered." *Ellason,* however, should not be construed as authority for mandating jurors to consider youth as a mitigating factor. The decision in *Ellason* hinged on the sufficiency of the evidence in regard to the special issue of future dangerousness. Appellant does not make a similar sufficiency claim. Points of error fourteen, fifteen, and sixteen are overruled.

### B. Prohibited Questioning of Venire

In points of error seventeen, eighteen, nineteen, and twenty, appellant asserts that the trial court denied him due process and effective assistance of counsel by prohibiting trial counsel from questioning veniremen about youth as a mitigating factor. Defense counsel began his line of questions by asking a prospective juror whether she would be willing to consider mitigating evidence. After receiving an affirmative response, defense counsel then asked whether the venireman would consider appellant's youth at the time of the

offense. The veniremen answered affirmatively, but stated it would depend on the age of the defendant at the time of the offense. Defense counsel then attempted to solicit how the venireman would qualify a nineteen or twenty year old defendant. The State's objection to this question was sustained. In sustaining the objection, the court explained that whether "youth" includes someone in their early twenties was entirely for the juror to decide and that counsel was not entitled to specific comments on such matters. We agree.

In *Trevino v. State* we held that trial courts properly limit a line of questioning when the questions appear designed "to bind the prospective jurors as to whether they would mitigate punishment due to the age of the offender ('In dealing with the death penalty ... could you consider as mitigation or in lessening the punishment the youthful age of a person convicted of capital murder')". 815 S.W.2d 592, 599 (Tex.Crim.App.1991). See also *Raby v. State*, 970 S.W.2d 1, 3 (Tex.Crim.App. 1998). Defense counsel's question was improper. Thus, the trial court did not abuse its discretion in refusing to allow the questioning. Points of error seventeen, eighteen, nineteen, and twenty are overruled.

### XIV. Challenge for Cause to Venireman Pair

In appellant's twenty-first point of error he asserts that the trial court erred in denying appellant's challenge for cause to venireman Pair. During the prosecutor's questioning of Pair he was asked if it is "fair to assume that you believe that some capital murderers that are convicted deserve the death penalty and others don't?" To this question Pair responded, "I believe that all capital murders would be—could be—should be committed to the death penalty." Defense counsel challenged for cause "... based on his answer that everyone that's convicted of capital murder *should* be given the death penalty." (emphasis added). The court denied the challenge for cause.

While a defendant may challenge a venireman for cause under Article 35.16(c) where that person "has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely," an ambiguous statement, such as the one offered by this venireman, does not unequivocally establish an individual's inability to follow the law.[16] Rather, in examining the substance of voir dire this Court views the totality of a venireman's testimony in determining whether it supports the findings of a trial court. *Howard v. State*, 941 S.W.2d, 102 (Tex.Crim. App.1996).

In this case, Pair made his support of the death penalty known to the trial court. Thereafter, the record reflects that Pair repeatedly and consistently stated he would: (1) listen and consider all evidence during trial, (2) convict only if he was convinced beyond a reasonable doubt, and then, if the trial proceeded to the punishment phase (3) answer fairly the special issues relating to the death penalty. The trial court did not abuse its discretion in denying the challenge for cause. Appellant's twenty-first point of error is overruled.

### XV. Constitutional Challenges to the Texas Death Penalty

In appellant's last eleven points of error, he challenges the constitutionality of the death penalty as administered under Texas law.

In points of error twenty-seven and twenty-eight appellant asserts that the trial court's instruction on the *Penry* special issue [17] makes meaningful appellate review

**16.** Without delving into semantics, Pair's response, "I believe that all capital murders would be—could be—should be committed to the death penalty" is subject to various interpretations.

**17.** Tex.Code.Crim. Proc. Ann. art. 37.071 § 2(e)

of the sufficiency of the evidence supporting the special issue impossible. These issues have already been decided against the appellant. *Green v. State*, 934 S.W.2d 92 (Tex.Crim.App.1996); *McFarland v. State*, 928 S.W.2d 482 (Tex.Crim.App. 1996); and *Lawton v. State*, 913 S.W.2d 542, 557 (Tex.Crim.App.1995). Points of error twenty-seven and twenty-eight are overruled.

In point of error twenty-nine appellant alleges the due process clause of the Fourteenth Amendment to the United States Constitution requires the Court to engage in a proportionality review in death penalty cases. This argument is without merit. The United States Supreme Court has held the Eighth Amendment, applicable to the states through the Fourteenth Amendment, does not require a proportionality review in death penalty cases. *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). We have repeatedly reaffirmed the holding in *Pulley*. See, *Pondexter v. State*, 942 S.W.2d 577 (Tex. Crim.App.1996); *Morris v. State*, 940 S.W.2d 610 (Tex.Crim.App.1996); *Hughes v. State*, 897 S.W.2d 285 (Tex.Crim.App. 1994). Point of error twenty nine is overruled.

In point of error thirty appellant alleges the Texas capital sentencing statute's definition of "mitigating evidence" is unconstitutional because it limits the Eighth Amendment concept of mitigation to factors that render a capital defendant less morally blameworthy for the commission of capital murder. This argument was addressed and rejected in *Cantu v. State*, 939 S.W.2d 627, 648–649 (Tex.Crim.App. 1996). Point of error thirty is overruled.

In point of error thirty-one appellant asserts that the statutory *Penry* special issue is unconstitutional because it fails to place the burden of proof on the State regarding aggravating evidence. We specifically rejected this argument in *Williams v. State*, 937 S.W.2d 479, 491 (Tex.Crim.App.1996). Point of error thirty-one is overruled.

In point of error thirty-two appellant contends that the Texas capital sentencing statute's failure to inform the jury of the result of a single hold-out juror on any special issue violates the Eighth and Fourteenth Amendments. This specific argument was rejected in *Pondexter v. State*, 942 S.W.2d 577 (Tex.Crim.App.1996), *cert. denied*, —— U.S. ——, 118 S.Ct. 85, 139 L.Ed.2d 42 (1997). Point of error thirty-two is overruled.

In point of error thirty-three appellant alleges that the statutory *Penry* special issue is facially unconstitutional under the Eighth and Fourteenth Amendments because it permits the very type of open-ended discretion condemned by the United States Supreme Court in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). In *Pondexter*, 942 S.W.2d at 587, we explained how this argument and such comparisons to *Furman* fail. Point of error thirty-three is overruled.

In point of error thirty-four appellant claims that in view of the many different capital sentencing schemes that have been in operation in Texas since 1989, the Texas death penalty has been arbitrarily imposed and, thus, is unconstitutional under the Eighth Amendment and Equal Protection Clause of the Fourteenth Amendment. In *Lawton v. State*, 913 S.W.2d 542, 559 (Tex. Crim.App.1995), we rejected this "patchwork quilt" argument. See *Powell v. State*, 897 S.W.2d 307 (Tex.Crim.App. 1994). More recently, we reiterated that it is incumbent upon the defendant to show that in its operation the statute is unconstitutional as to him in his situation; that it may be unconstitutional as to others is not sufficient. *Raby v. State*, 970 S.W.2d 1, 7 (Tex.Crim.App.1998), citing *Santikos v. State*, 836 S.W.2d 631 (Tex.Crim.App. 1992), *cert. denied*, 506 U.S. 999, 113 S.Ct. 600, 121 L.Ed.2d 537 (1992). Appellant's thirty-fourth point of error is overruled.

In points of error thirty-five and thirty-six appellant claims the death penalty, at

least as presently administered, is cruel and unusual under the Fourteenth Amendment and Article 1, § 13 of the Texas Constitution. Appellant's argument fails on both grounds. We have previously ruled contrary to these contentions. See, *McFarland v. State*, 928 S.W.2d 482 (Tex. Crim.App.1996); *Anderson v. State*, 932 S.W.2d 502, 509 (Tex.Crim.App.1996). Points of error thirty-five and thirty-six are overruled.

■ In point of error thirty-seven appellant contends that we must reverse his death sentence on the ground that racial discrimination continues to taint the Texas death penalty in violation of the Eighth Amendment and Equal Protection Clause of the Fourteenth Amendment. Appellant cites statistical studies showing that the death penalty is more likely to be imposed when the victim is white, as opposed to when the victim is of another race. We do not agree that these statistical studies establish his claim. *See McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Furthermore, appellant fails to explain why Texas statutes cannot make *his* conduct subject to the death penalty. And, appellant has not demonstrated that Texas' death penalty scheme was unconstitutionally applied to him. *Cockrell v. State*, 933 S.W.2d 73, 94 (Tex.Crim.App. 1996). Point of error thirty-seven is overruled.

The judgment of the trial court is AFFIRMED.

MANSFIELD, J. concurred in point of error twelve and otherwise joined the opinion of the court.

MEYERS and JOHNSON, JJ. concurred in the result.